# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

Victor M. Javitch, Receiver,                              Case No. 1:01CV780

               Plaintiff

          v.                                         **ORDER**

First Union Securities, Inc., et al.,

               Defendants

This is the last pending suit in a galaxy of satellite litigation stemming from a massive fraud conducted by James Capwill; Viatical Escrow Services (VES), the escrow company of which Capwill was the principal; and Capital Fund Leasing (CFL), a shell company through which Capwill diverted VES funds and made them available for his own illegitimate purposes.

Victor Javitch, acting in his capacity as VES and CFL's court-appointed receiver, brought this action in 2001 to recover $10.5 million that Capwill diverted from VES and used to open brokerage accounts with defendant First Union Securities, Inc. The receiver's complaint made clear, and subsequent litigation has confirmed, that the vast majority of funds that Capwill deposited with First Union belonged, not to either of the entities in receivership, but rather to investors whose money VES had been holding in escrow.

In 2014 – and after one appeal to the Sixth Circuit, two rounds of briefing on the arbitrability of the receiver's claims, and years of proceedings before an arbitration panel – my late colleague, Sr. U.S. District Judge David Katz (who, before his untimely death in 2016, had presided over this

and all numerous related cases), ruled that the receiver did not have standing to pursue any claim "for money damages to recover funds deposited with [First Union] which were held by VES for the benefit of non-party customers[.]" *Javitch v. First Union Secs., Inc.*, 2014 WL 3510603, *2 (N.D. Ohio). This was because the receiver could "only assert claims regarding Receivership property," and the funds that ultimately belonged to the investors "were beyond the scope of the Receiver's authority." *Id.* at *3.

Judge Katz's ruling precipitated the filing of a motion to intervene by two viatical investment companies that hired VES to act as its escrow agent, Liberte Capital Group, LLC, and Alpha Capital Group, LLC (the investors). (Doc. 112). Also pending are motions by the Liberte and Alpha investors for class certification. (Docs. 113, 114).

Jurisdiction is proper under 28 U.S.C. § 1332(a)(1).

Because the motion to intervene is untimely, and because the investors in any event have no substantial interest in this case, I deny the motion to intervene. I also deny the class-certification motions as moot.

## Background

Judge Katz and the Sixth Circuit have discussed this case's lengthy background in many prior decisions. *E.g.*, *Javitch v. First Union Secs., Inc.*, 315 F.3d 619 (6th Cir. 2003); *Liberte Cap. Grp., LLC v. Capwill*, 248 F. App'x 650 (6th Cir. 2007) (the *Linke* case); *Javitch*, *supra*, 2014 WL 3510603 at *2. Nevertheless, because that background is critical to understanding the result I reach in this order, I set it forth in some detail below.

2

### A. The *Liberte Capital* Litigation

The case now pending before me has its origins in a suit filed in 1999, *Liberte Cap. Grp., LLC v. Capwill*, Case No. 5:99CV818 (N.D. Ohio).

Liberte was an Ohio-based viatical investment company. It purchased life insurance policies from "viators" – that is, policyholders who were terminally ill or elderly and in poor health – in exchange for a discounted, lump-sum payment to the viators. *Wuliger v. Mfgs. Life Ins. Co.*, 567 F.3d 787, 790 (6th Cir. 2009). When the viator died, Liberte and its investors were entitled to collect the policy's death benefit.

Liberte marketed these policies as investment vehicles to the public. "The price of the investment include[d] the funds to be paid to the owner of the policy, as well as funds to be held in escrow to pay the life insurance premiums." *Javitch*, *supra*, 315 F.3d at 621 n.3.

In 1997, Liberte contracted with Capwill and VES "to provide trustee services in handling monies received from investors to buy policies and to service the payment of the premiums." *Linke*, *supra*, 248 F. App'x at 651. But the fraudulent practices of Capwill and Liberte's principal, Richard Jamieson, soon tore the investment scheme apart.

"Many of the insurance policies underlying the viatical investments that Liberte and Alpha had marketed were procured through fraud," *Linke*, 248 F. App'x at 651, meaning that the policies were void when written and neither could nor did yield any payout to the investors. Jamieson, moreover, had made numerous misrepresentations about the riskiness of viatical investments and the supposed independence of Liberte's escrow agent, VES, from Jamieson. *See U.S. v. Jamieson*, 427 F.3d 394, 400–01 (6th Cir. 2005) (recounting Jamieson's conviction on two conspiracy counts

3

and 155 counts of money laundering). Lastly, "Capwill and his escrow companies embezzled or absconded with the funds that they held in escrow[.]" *Linke*, *supra*, 248 F. App'x at 651.

When all was said and done, the investors' total losses approached $250 million.

In 1999, Liberte sued Capwill, VES, and CFL for wrongfully transferring money VES held in escrow to Capwill's personal bank accounts.

Shortly after the *Liberte Capital* case began, the then-presiding judge, the late Honorable David D. Dowd, appointed Javitch as the receiver for VES and CFL. Javitch's task was to "take and maintain exclusive and complete custody, control and possession of all the assets belonging to VES and CFL" and "otherwise manage, maintain and protect the assets of VES and CFL" for the benefit of their creditors. (Doc. Entry of July 15, 1999, *Liberte Cap. Grp., LLC v. Capwill*, Case No. 5:99CV818 (N.D. Ohio)).

Judge Dowd also granted the receiver the power to sue to recover property that belonged to the receivership entities, and he "enjoined and stayed" all others "from commencing or continuing any action at law or suit or proceedings in equity to foreclose any lien or enforce any claim against . . . VES and/or CFL or their property." (*Id.* at 5–6).

After it became apparent that Capwill had used VES funds to open bank and brokerage accounts – some in his own name, others in CFL's name, and still others in the names of his friends and associates – Judge Dowd extended the receiver's authority "to cover any and all interests in any bank accounts or brokerage accounts which are or were in the name of James A. Capwill . . . or any other name into which estate funds went[.]" (Doc. 100–1 at 3).

4

**B. The Receiver's Complaint**

At issue in this case, which the receiver filed in April, 2001, is roughly $10.5 million that Capwill diverted from VES and used to open brokerage accounts with First Union through one of its brokers, defendant Michael D'Angelo.

The receiver's complaint pleaded nine counts: negligence, negligent supervision, breach of fiduciary duties, fraud, conspiracy to defraud, RICO violations, aiding and abetting fraud and violations of federal securities law, conversion, and money had and received. (Doc. 1 at ¶¶23–88).

At its core, the theory of the complaint was that the defendants knew or should have known that Capwill, who was only an accountant and escrow agent, had neither "substantial personal financial assets or resources" nor "significant or meaningful experience in financial investing." (*Id.* at ¶49(a)–(c)). This led the defendants to recommend investments that were not suitable to Capwill and to mishandle the money he had invested. Moreover, First Union also knew or should have known that most of VES's assets "were to be held in actual or constructive trust, and with fiduciary duties to others." (*Id.* at ¶49(d)).

Given all that, the receiver maintained, the defendants ought to have known that:

> [t]he moneys used to open the brokerage accounts . . . were wrongfully, negligently, intentionally, fraudulently or recklessly diverted from accounts of CFL, Alpha, VES, Liberte, [and others] to these brokerage accounts by Mr. Capwill in violation of [his, CFL's, and VES's] fiduciary duties.

(*Id.* at ¶21; *see also id.* at ¶49(e) ("the money/funds used to open the brokerage accounts . . . were not the personal funds of Mr. Capwill, or the earnings, capital, assets and/or retained earnings of . . . CFL or VES")).[1]

---

[1] The receiver later amended his complaint to add a claim of aiding and abetting a breach of fiduciary duty and dismiss the RICO and aiding-and-abetting-a-securities-violation claims.

5

## C. Arbitration

The defendants did not answer or move to dismiss the receiver's complaint. Rather, they immediately moved to compel arbitration. (Doc. 7). Their filing raised two issues that would occupy the litigation for the next thirteen years: whether the receiver's claims were subject to arbitration, and whether the receiver had standing to recover funds deposited with First Union that VES had held in escrow and for the benefit of viatical investors.

### 1. Arbitrability of the Dispute

When Capwill opened the accounts at First Union, he signed an agreement specifying, *inter alia*, that "all claims or controversies" arising from the accounts were subject to arbitration. (Doc. 7–2 at 2).

Relying on that provision, the defendants argued that the receiver "stood in the shoes" of VES and CFL and thus had to take his claims to arbitration. (Doc. 7). Judge Katz disagreed, concluding that the receiver's claims were not subject to arbitration because: 1) Javitch himself had not signed the arbitration agreements; and 2) in any event his complaint contested the validity of the agreements. (Doc. 20). The defendants appealed.

### a. The *Javitch* Decision

In *Javitch*, *supra*, 315 F.3d at 627, the Sixth Circuit reversed, holding that the receiver was "bound to the arbitration agreements to the same extent that the receivership entities would have been absent the appointment of the receiver."

The receiver's principal argument on appeal was that the arbitration agreement did not bind him because he was not suing on behalf of VES and CFL. Rather, the receiver maintained that he

6

was suing "on behalf of the 'true owners of the assets': that is, the creditors who were defrauded by

Capwill." *Id.* at 625.

The Circuit rejected that argument. Based on its "assessment of both the claims being

asserted by Javitch and the authority granted to him by the order appointing him as receiver," the

court explained, it was clear that "Javitch has asserted claims belonging to the receivership entities."

*Id.* at 627. In so holding, however, the Circuit explained at length (though in dicta) why a receiver

would not have standing to assert claims on behalf of a receivership entity's creditors or investors:[2]

> The general rule is that a receiver acquires no greater rights in property than the
> debtor had and that, except as to liens in existence at the time of the appointment, the
> receiver holds the property for the benefit of general creditors under the direction of
> the court. *In re K-T Sandwich Shoppe of Akron*, 34 F.2d 962, 963 (6th Cir. 1929).
> Because they stand in the shoes of the entity in receivership, receivers have been
> found to lack standing to bring suit unless the receivership entity could have brought
> the same action. *See, e.g., Goodman v. FCC*, 182 F.3d 987, 991–92 (D.C. Cir. 1999)
> (receiver did not have standing to sue on behalf of customers and creditors of entity
> in receivership); *Scholes v. Lehmann*, 56 F.3d 750, 753–55 (7th Cir. 1995) (receiver
> for corporation could sue for diversion of assets as fraudulent conveyances by
> controlling shareholder).
>
> Applying this general rule, the court in *Hays & Co. v. Merrill Lynch, Pierce, Fenner
> & Smith, Inc.*, 885 F.2d 1149, 1153–54 (3d Cir. 1989), concluded that arbitration
> agreements, like other prepetition contractual commitments, were binding on the
> bankruptcy trustee to the same extent that they would bind the debtor. As a result, the
> court held that
>
>> in actions brought by the trustee as successor to the debtor's interest under
>> section 541, the "trustee stands in the shoes of the debtor and can only assert
>> those causes of action possessed by the debtor. [Conversely,] [t]he trustee is,
>> of course, subject to the same defenses as could have been asserted by the
>> defendant had the action been instituted by the debtor." *Collier on
>> Bankruptcy*, ¶323.029[4].

---

[2] According to the Circuit, whether the receiver had standing to bring claims on the investors'
behalf was a "question . . . not presented by these interlocutory appeals"; therefore, the court
"express[ed] no opinion concerning the receiver's standing to assert claims on behalf of any party
other than VES and CFL[.]" *Javitch, supra*, 315 F.3d at 627 n.7.

*Id.* at 1154 (footnotes omitted and alteration in original). Consistent with this rationale, the court also concluded that the trustee could not be compelled to arbitrate creditor claims that it was unauthorized to assert under 11 U.S.C. § 544(b). *Id.* at 1155. Javitch argues that *Hays* supports the district court's refusal to compel arbitration because his complaints attempt to assert claims on behalf of the defrauded investors. The district court, however, did not distinguish *Hays* on that basis.

The district court's opinions suggest that the receiver could not bring these actions on behalf of the investors. The court explained that it was

> mindful of a receiver's proper role in litigation such as in this case *sub judice*:

>> Fraud on *investors* that damages those *investors* is for those *investors* to pursue – not the receiver. By contrast, fraud on the *receivership entity* that operates to *its* damage is for the *receiver* to pursue (and to the extent that investors as the holders of equity interests in the entity may ultimately benefit from such pursuit, that does not alter the proposition that the receiver is the proper party to enforce the claim).

> *Scholes v. Schroeder*, 744 F. Supp. 1419, 1422–23 (N.D. Ill. 1990) (emphasis in original).

> The Complaint clearly contends that the funds used to open accounts with the Defendants "were wrongfully, negligently, intentionally, fraudulently or recklessly diverted from accounts of CFL" in violation of Capwill's, CFL's, and VES's standard of care, their fiduciary duties, among others. Compl. at ¶21.

> In accordance with the Order of Appointment in the *Liberte* case, the Plaintiff Receiver has been duly authorized by the Court to "oversee and to administer the business and assets of VES and CFL" by various means, including the institution of litigation to preserve the Receivership property. The issue for resolution in the case at bar is whether the Receiver for VES and CFL is bound by the agreement to arbitrate alleged to have been signed by Capwill.

Thus, the district judge, who was also presiding over the *Liberte* case, rejected the contention that Javitch could escape the arbitration agreements on the grounds that he was bringing suit on behalf of the defrauded investors and funding companies.

*Javitch*, 315 F.3d at 625–27.

### b. Remand

The Sixth Circuit remanded the case to Judge Katz to consider whether the arbitration agreements were enforceable, and whether the doctrine of equitable estoppel precluded the receiver from trying to avoid arbitration. *Id.* at 628–29. Ultimately, in 2011, Judge Katz ruled in the defendants' favor on both issues, ordered the parties to proceed to arbitration, and stayed the case pending the completion of arbitration. (Doc. 85).

### 2. The Receiver's Standing

Arbitration began on November 28, 2011, and continued without any need for court intervention until February, 2014. (Doc. 92).

Shortly after proceedings got underway, it appears, "[a] dispute [arose] . . . regarding the scope of the Receiver's standing to pursue claims for VES and CFL." *Javitch*, *supra*, 2014 WL 3510603 at *2. The defendants argued that the receiver lacked standing to assert any claims relating to First Union brokerage accounts funded with money that VES had held in escrow for third-party investors. (Doc. 101). This was so, defendants maintained, because such claims redounded to the benefit of the investors, rather than VES or CFL, and thus were for the investors to pursue.

The receiver vigorously disagreed. (Docs. 100, 103). He maintained that he could assert these claims because VES, which had held the investors' funds in trust for the investor's benefit, could have brought an action against First Union for the diminishment of this "trust property."

In November, 2012, the parties temporarily resolved the standing question by means of stipulation. The stipulation provided, *inter alia*, that the receiver "lacks standing to assert any claims on behalf of viatical investors; those claims are for the viatical investors to pursue. Therefore, [the

9

receiver] is only asserting claims on behalf of one or more of the receivership entities [he] represents." (Doc. 101–3).

Despite the seeming clarity of that language, the parties had different ideas about what the stipulation meant.

In the defendants' view, the stipulation "precluded the Receiver from asserting any claims to recover funds in which the Receivership entities lacked a proprietary interest[.]" (Doc. 103 at 6). The receiver, in contrast, believed that the stipulation allowed him to assert claims "to recover trust property in which a Receivership entity held a titular – albeit no proprietary – interest, i.e., trust funds deposited with VES by viatical investors." (*Id.*).

Notwithstanding many attempts to resolve the disagreement, the parties came to an impasse on the standing question. They agreed to have the arbitration board certify the dispute to Judge Katz, and the board boiled the dispute down to two questions:

> Whether Claimant, in his capacity as Receiver for Viatical Escrow Services ("VES") and Capital Fund Leasing ("CFL"), can assert claims for money damages to recover funds deposited with Respondents, which were held by VES for the benefit of non-party customers under trust property theories.

> If so, does the doctrine of *in pari delicto* defeat or diminish such claims.

*Javitch*, *supra*, 2014 WL 3510603 at *2.

In July, 2014, Judge Katz ruled that the receiver had no standing to recover funds deposited with First Union that VES had held in trust for the investors. His decision relied almost entirely on the Sixth Circuit's 2003 decision in *Javitch*:

> Regarding the first question, the Court finds that the Receiver *cannot* assert claims for money damages to recover funds deposited with Respondents which were held by VES for the benefit of non-party customers under trust property theories. As the Sixth Circuit has explained:

10

The general rule is that a receiver acquires no greater rights in property than the debtor had and that, except as to liens in existence at the time of the appointment, the receiver holds the property for the benefit of general creditors under the direction of the court. *In re K-T Sandwich Shoppe of Akron*, 34 F.2d 962, 963 (6th Cir. 1929). Because they stand in the shoes of the entity in receivership, receivers have been found to lack standing to bring suit unless the receivership entity could have brought the same action. *See, e.g., Goodman v. FCC*, 182 F.3d 987, 991–92 (D.C. Cir. 1999) (receiver did not have standing to sue on behalf of customers and creditors of entity in receivership); *Scholes v. Lehmann*, 56 F.3d 750, 753–55 (7th Cir. 1995) (receiver for corporation could sue for diversion of assets as fraudulent conveyances by controlling shareholder).

*Javitch*, 315 F.3d at 625. The Sixth Circuit further noted:

Fraud on *investors* that damages those *investors* is for those *investors* to pursue – not the receiver. By contrast, fraud on the *receivership entity* that operates to *its* damage is for the *receiver* to pursue (and to the extent that investors as the holders of equity interests in the entity may ultimately benefit from such pursuit, that does not alter the proposition that the receiver is the proper party to enforce the claim).

*Id.* (emphasis in original and citation omitted).

It is the Receiver's sole responsibility "by various means, including the institution of litigation to preserve the Receivership property." *Id.* at 626. Finally, the court stated:

We are convinced, based on our assessment of both the claims being asserted by Javitch and the authority granted to him by the order appointing him as receiver, that the district court properly found that Javitch has asserted claims belonging to the receivership entities. This court explained, albeit in another context, that although the stated objective of a receivership may be to preserve the estate for the benefit of creditors, that does not equate to a grant of authority to pursue claims belonging to the creditors. *See Jarrett v. Kassel*, 972 F.2d 1415, 1426 (6th Cir. 1992) (customers could not rely on actions taken by corporate receiver, despite the receiver's authority to protect their interests in the receivership property). Thus, we find that Javitch, who is bringing claims on behalf of VES and CFL, is bound to the arbitration agreements to the same extent that the receivership entities would have been absent the appointment of the receiver.

*Id.* at 627.

11

The Sixth Circuit made it explicit in *Javitch* that the Receiver may only assert claims regarding Receivership property. Thus, he may not now seek to extend his authority to that of a trustee. The Receiver's new argument that he may assert claims for money damages to recover funds deposited with Respondents which were held for the benefit of non-party customers under trust property theories is beyond the scope of the Receiver's authority. *Id.* at 625.

\* \* \*

Accordingly, in response to the first certified question from the Arbitration Board, the answer is "No." The second certified question is moot.

*Javitch*, *supra*, 2014 WL 3610603, at *2–*4 (emphasis in original).

With the scope of the receiver's standing now settled, the parties returned to arbitration.

The parties were able to agree that Judge Katz's decision limited the receiver to pursuing claims "involv[ing] the suitability and handling of the investments in Capwill's Wells Fargo accounts."[3] (Doc. 116 at 11; *see also* Doc. 118 at 4 (investors stating that "the effect of [Judge Katz's] July 2014 decision was to reduce the Receiver's arbitration claims to mere 'suitability and handling' claims")).

In May, 2015, the parties settled the claims that the receiver was pursuing arbitration. (Doc. 116 at 4, 11; Doc. 118 at 4–6).

### D. Motion to Modify the Litigation Injunction

Close on the heels of Judge Katz's decision, the Liberte and Alpha investors sought to "modify the blanket injunction in [the *Liberte Capital*] case and create a litigation exception enabling the investor classes to assert claims against the *First Union* defendants directly." (Doc. 2918 at 10, *Liberte Cap. Grp., LLC v. Capwill*, Case No. 5:99CV818 (N.D. Ohio)). They argued that, in light of his limited standing, the receiver was unable "to afford full and complete relief to the investors"

---

[3] Wells Fargo Advisors, LLC, is the successor-in-interest to First Union Securities, Inc.

because "he will only be able to pursue a fraction of the more than ten million dollars in trust funds funneled by Capwill into accounts at [First Union]." (*Id.* at 9).

In January, 2015, and over the *First Union* defendants' objections, Judge Katz granted the motion:

> This Court has held that the Receiver cannot assert claims for money damages to recover funds deposited as those claims redound to the benefit of the investors. *See Javitch v. First Union*, No. 01 cv 780. (Doc. No. 110). Many, if not most, of the "investors" are involved as part of the Alpha and Liberte classes, and would benefit by being joined as parties in the *First Union* matter, which is now before an arbitration panel.

> The Court agrees with counsel for the Liberte and Alpha investors that the existing blanket injunction precludes those investors from entering that litigation in which they appear to have a substantial interest. For this reason the Court hereby modifies the blanket injunction to create a litigation exception to enable the above named investor classes the ability to assert claims on their behalf against the First Union defendants directly, either separately from or included in (by intervention) the pending *First Union* case.

(Doc. 2946 at 1–2, *Liberte Cap. Grp., LLC v. Capwill*, Case No. 5:99CV818 (N.D. Ohio)).

### E. Motion to Intervene

Three months after Judge Katz created the litigation exception, the Liberte and Alpha investors filed the pending motion for leave to file an intervening complaint. (Doc. 112). The defendants opposed the motion. (Docs. 116, 121). Judge Katz held oral arguments in August, 2015 (Doc. 125), but he passed away before ruling on the motion.

### Discussion

A third party may intervene in an action as "of right" if it "claims an interest relating to the property or transaction which is the subject of the action, and is so situated that disposing of the

action may as a practical matter impair or impede the movant's ability to protect its interest, unless the existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2).

The would-be intervenor "must establish four factors before being entitled to intervene: (1) the motion is timely; (2) the proposed intervenor has a substantial legal interest in the subject matter of the case; (3) the proposed intervenor's ability to protect their interest may be impaired in the absence of intervention; and (4) the parties already before the court cannot adequately protect the proposed intervenor's interest." *Coalition to Defend Affirmative Action v. Granholm*, 501 F.3d 775, 779 (6th Cir. 2007).

By contrast, a third party may intervene permissively if it "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). Whether permissive intervention is appropriate depends on "whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." *Design Basics, LLC v. A.J. Bokar Bldg. Co., Inc.*, 2016 WL 6067780, *1 (N.D. Ohio) (Gwin, J.).

### A. Timeliness

"The issue of timeliness is a threshold matter, and a district court's decision with respect to timeliness is reviewed for abuse of discretion." *DiLuzio v. Village of Yorkville, Ohio*, 2013 WL 12180485, *2 (S.D. Ohio). A request to intervene, whether as of right or permissively, must be timely. *Stupak-Thrall v. Glickman*, 226 F.3d 467, 471–72 (6th Cir. 2000)

The timeliness of an intervention motion depends on all the circumstances, including:

(1) the point to which the suit has progressed; (2) the purpose for which intervention is sought; (3) the length of time preceding the application during which the proposed intervenor knew or reasonably should have known of his or her interest in the case; (4) the prejudice to the original parties due to the proposed intervenor's failure, after he or she knew or reasonably should have known of his or her interest in the case, to

14

apply promptly for intervention; and (5) the existence of unusual circumstances militating against or in favor of intervention.

*U.S. v. City of Detroit*, 712 F.3d 925, 930–31 (6th Cir. 2013).

### 1. Progress of the Suit

As the investors accurately observe, this case, despite being nearly sixteen years old, has not progressed far at all. *Cf. Stupak-Thrall*, *supra*, 226 F.3d at 475 ("The absolute measure of time between the filing of the complaint and the motion to intervene is one of the least important of the[ ] circumstances" bearing on timeliness). The defendants have yet to file an answer, the parties have engaged in only limited discovery before the arbitration board, and Judge Katz's rulings dealt only with the arbitrability of the receiver's claims and his standing to pursue them.

Accordingly, the first factor favors intervention.

### 2. The Investors' Purpose in Seeking to Intervene

"The 'purposes of intervention' prong of the timeliness element normally examines *only* whether the lack of an earlier motion to intervene should be excused, given the proposed intervenor's purpose – for example, when the proposed intervenor seeks to intervene late in the litigation to ensure an appeal." *Id.* at 479 n.15 (emphasis in original).

Here, the investors' purpose for intervening – to prosecute claims that, until recently, they believed the receiver was properly asserting on their behalf (Doc. 112 at 7–8) – does not excuse the lack of an earlier motion to intervene.

In my view, this "purposes of intervention" prong overlaps substantially with the third factor in the timeliness analysis: the length of time before the intervention motion during which the investors knew of their interest in the case. As I explain in more detail, *infra*, in connection with the

15

third factor, the investors have long known – or, at the very least, should have long known – that it was incumbent on *them*, rather than the receiver, to assert claims seeking to recover funds that VES had held in escrow for their benefit.

Not only has the investors' stake in this case been evident since shortly after its inception, but their need to prosecute the claims themselves – and not rely on the receiver – was evident after the Sixth Circuit decided the *Javitch* case. Certainly the need to intervene was beyond peradventure after Judge Katz held – in another piece of satellite litigation – that the receiver could not pursue claims identical to the ones he tried to bring in this case. *Wuliger v. Star Bank*, 2008 WL 2323887, *1 (N.D. Ohio).

Given what the investors knew or should have known, they cannot now plausibly claim that Judge Katz's 2014 decision substantially changed the rules of the game, such that it can excuse the absence of an earlier intervention motion. Therefore, the second favor weighs against intervention.

### 3. The Investors' Notice of Their Interest in the Case

"The third factor is the length of time preceding the . . . motion to intervene, during which [the would-be intervenors] knew, or should have known, of their interest in the case." *Stupak-Thrall*, *supra*, 226 F.3d at 477. "An entity that is aware that its interests may be impaired by the outcome of the litigation is obligated to seek intervention as soon as it is reasonably apparent that it is entitled to intervene." *U.S. v. Tennessee*, 260 F.3d 587, 594 (6th Cir. 2001).

The intervenors argue that it was reasonable for them to try to intervene only after Judge Katz's 2014 decision defining the receiver's standing.

Until then, the intervenors allege, "they had been barred from presenting [their] claims due to a blanket injunction which prohibited the assertion of any claims relating to [the brokerage

16

accounts at issue] by anyone other than the Receiver." (Doc. 112 at 8). It was the investors'
understanding, moreover, "that the Receiver, as the successor to VES, was pursuing such claims on
their behalf, and that their interest in the instant litigation was therefore fully protected." (*Id.*).
Finally, the investors argue that they acted with dispatch by moving to lift the litigation injunction
only seventeen days after Judge Katz resolved the standing question.

Defendants contend that the investors "have known since the Sixth Circuit's 2003 decision
[in *Javitch*] . . . that they had to pursue their own damage claims[,]" but that they nevertheless "sat
on their rights for over a decade." (Doc. 116 at 1). They also assert that another Sixth Circuit
decision, the *Linke* case, *supra*, 248 F. App'x at 655–64, established that the receiver did not have
standing to pursue claims involving escrow funds that VES had held in trust.

In reply, the investors maintain that the defendants "never directly challenged the Receiver's
standing in this case until February 22, 2012 – the date they filed their joint answer in the arbitration
proceedings." (Doc. 112 at 9).

I disagree with the investors' contentions and conclude that they have been on notice of both
their interest in the case, and their need to intervene to protect that interest, for at least twelve years.

First, nowhere in the investors' pleadings do they discuss when they learned that Capwill had
plundered funds that they had entrusted to VES. In contrast, the docket in the *Liberte Capital*
litigation reflects that an order of garnishment, dated April 8, 1999, identified Capwill's accounts
at First Union (then known as Everen Securities, Inc.) as property of the receivership estate. (Doc.
7, *Liberte Cap. Grp., LLC v. Capwill*, Case No. 5:99CV818 (N.D. Ohio)). Shortly thereafter, in
April, 2001, the receiver filed the pending complaint purporting, *inter alia*, to recover those funds
on the investors' behalf.

17

Thus, the connection between Capwill and VES, the investors' funds, and First Union has been a matter of public record since at least 2001. Nevertheless, the investors did not try to intervene until 2015.

Second, it is true that *Javitch*, *supra*, 315 F.3 at 625–27, did not hold that the receiver lacked standing to pursue claims involving the investor funds that VES held in escrow. The case merely held that, because the receiver's complaint *had* alleged some "claims belonging to the receivership entities," the receiver was "bound to the arbitration agreements to the same extent that the receivership entities would have been absent the appointment of the receiver." *Id.* at 627; *see also id.* at 627 n.7 ("we express no opinion concerning the receiver's standing to assert claims on behalf of any party other than VES and CFL").

Nevertheless, after *Javitch*, the writing was on the wall.

It was the receiver's position in that case that the arbitration agreements Capwill had signed did not bind him because the receiver was bringing claims, not on the receivership entities' behalf, but on behalf of the investors. *Id.* at 625. Yet the Sixth Circuit did not reject that argument simply by looking at the receiver's complaint and noting that the receiver had pleaded claims on behalf of VES and CFL. Instead, it took a lengthy detour into the law of receivers to highlight these fundamental limitations on the receiver's power to sue:

- "a receiver acquires no greater rights in property than the debtor had";

- "receivers have been found to lack standing to bring suit unless the receivership entity could have brought the same action";

- "[f]raud on *investors* that damages those *investors* is for those *investors* to pursue – not the receiver"; and

18

- "although the stated objective of a receivership may be to preserve the estate for the benefit of creditors, that does not equate to a grant of authority to pursue claims belonging to creditors."

*Id.* at 625, 627 (emphasis in original).

The upshot of that detour, and the quotes set forth above, was to cast at least some doubt – significant doubt, to be quite candid – on the receiver's power to assert claims on the investors' behalf. Indeed, the court seemed to have drawn, at least in a general fashion, parallels between the kinds of claims the receiver was purporting to assert – claims "on behalf of the 'true owners of the assets': the creditors who were defrauded by Capwill," *id.* at 625 – and the kinds of claims that the law forbade the receiver to bring – "claims belonging to the creditors." *Id.* 627.

After *Javitch*, then, the investors should have known there was some question whether the receiver had standing to recover funds that the investors had entrusted to VES. Indeed, there is hardly any daylight at all between *Javitch* and Judge Katz's 2014 decision regarding the scope of the receiver's standing: he relied nearly exclusively on *Javitch* to hold that the receiver lacked standing to recover investor funds.

Third, Judge Katz closed whatever door *Javitch* may have left ajar in his 2008 decision in the *Star Bank* satellite litigation.[4]

In *Star Bank*, the receiver asserted claims that supposedly "belonged to VES and CFL because of their roles as trustees for investors' investment proceeds, placed in their hands for safe-keeping." (Doc. 160 at 1, *Wuliger v. Star Bank*, Case No. 1:02CV1513 (N.D. Ohio)). Those claims,

---

[4] The parties' briefs on the intervention question do not discuss *Star Bank*, but their briefs addressing the receiver's standing to recover investor funds did discuss the case. (Doc. 101 at 2; Doc. 103 at 12).

which are essentially identical to Liberte's and Alpha's claims here, were, Judge Katz ruled, not for the receiver to assert:

> It is the Plaintiff's position that the investor claims still remain and the Receiver has authority to pursue such claims. However, to an extent that such claims are presented on behalf of the investors, the Sixth Circuit recently held that the Receiver is without authority to proceed forward on those claims. *See Liberte Capital Group, LLC v. Capwill*, 248 F. App'x 650 (6th Cir. 2007), reh'g denied, (January 23, 2008). To the extent that such claims are premised, they are dismissed for lack of standing.

*Star Bank*, *supra*, 2008 WL 2323887 at *1.

Fourth, the Sixth Circuit's decision in the *Linke* case, *supra*, 248 F. App'x 655–64, does not support the investors' claim that it was reasonable for them to rely on the receiver to prosecute their claims instead of trying to intervene sooner.

In *Linke* – yet another offshoot of the *Liberte Capital* litigation – the receiver alleged that a number of brokerage firms had fraudulently induced Liberte investors to invest in viaticals. *Id.* at 652. According to the receiver, he had standing to assert those claims because "VES [itself] had standing to pursue the claims as trustee over investor funds," on the theory that Capwill's misconduct had diminished the property that VES held in trust. *Id.* at 662.

The Sixth Circuit disagreed, concluding that *even if* the receiver had standing to sue for diminution in trust property, the claims at issue did not involve trust property:

> while [the receiver] may be correct that he has [the] right to sue for "tortious conduct resulting in the diminishment of trust property" and that "trustees have standing to maintain any action to remedy an injury with respect to trust property," those propositions do not vest him with authority to assert [the investors'] arbitration claims in the instant case, as claims involving injury or diminution of trust property are not the type of claim at issue here.

*Id.* at 663.

20

As is plain, the Sixth Circuit did not hold, or necessarily even endorse the proposition, that the receiver could sue to recover investor funds that VES had held in trust. The court simply said that that "may" be the case.

Finally, the litigation injunction in the *Liberte Capital* case did not actually prevent the investors from trying to intervene in this case much earlier.

Once Judge Katz ruled that the receiver lacked standing to bring these claims, the investors immediately appeared in the *Liberte Capital* case and asked Judge Katz to create a "litigation exception" permitting them to appear in this case and seek leave to intervene. That same procedure was, however, open to them at any time after *Javitch* and *Star Bank*. But despite the clear implications of the former case and the unambiguous holding in the latter, the investors did not ask Judge Katz to modify the injunction.  Nor do their current briefs satisfactorily explain that omission. *Cf. Stotts v. Memphis Fire Dep't*, 679 F.2d 579, 584 & n.3 (6th Cir. 1982) (intervenors "should have attempted to intervene when they first became aware of the action, rather than adopting a 'wait-and-see' approach").

For all of these reasons, I find that the investors have long been on notice of both their interest in this case and their need to intervene in the litigation. They knew or should have known of their interest in the case by 2001, when the receiver filed the pending complaint, and their need to intervene by, at the absolute latest, 2008, when Judge Katz issued the *Star Bank* decision.

The third factor therefore weighs, and, I believe, weighs heavily, in favor of denying the motion.

### 4. Prejudice

"The only prejudice relevant to the timeliness determination is incremental prejudice from a would-be intervenor's delay in intervening, not the intervention itself." *Davis v. Lifetime Cap., Inc.*, 560 F. App'x 477, 493 (6th Cir. 2014).

The investors maintain that intervention now will not prejudice the defense, primarily because the investors want to raise the same claims that "the Receiver has attempted to pursue . . . throughout the course of this litigation. (Doc. 112 at 12).

In their briefs, the defendants do not expressly address the prejudice prong.

Instead, to the extent that their briefs touch on prejudice, the defendants focus on the supposed impropriety of allowing the investors to intervene given the current posture of the case. According to the defense, this suit is essentially a dead letter now that: 1) Judge Katz has ruled that the receiver lacks standing to recover investor funds; and 2) the receiver has, during arbitration proceedings, settled the claims he does have standing to pursue. Because, the defendants maintain, the suit is all but over, it would be inappropriate to permit the investors to intervene and thereby broaden the scope of the litigation.

There is much force to this argument, but the defense has not persuaded me that it bears on the prejudice analysis *vis-a-vis* timeliness. What the defendants are really arguing is that the investors have no legal interest in this case. But I will take up that issue below, rather than here as part of the timeliness inquiry. As the prejudice to allowing intervention at this date seems minimal, the fourth factor supports intervention.

### 5. Unusual Circumstances

Finally, the investors contend that "if ever there were unusual circumstances militating in favor of intervention, this would be that case." (Doc. 112 at 12). According to the investors, the unusual circumstances include: 1) the litigation injunction that "barred" them from raising their claims "for well over a decade"; 2) their "good faith belief that the Receiver possessed both the authority and the standing to pursue" their claims; and 3) defendants' failure to challenge the receiver's standing until 2012. (*Id.* at 12–13).

I disagree that these circumstances are particularly unusual or that, whether considered separately or together, they militate in favor of intervention.

For one thing, as I have already discussed, the investors could have tried to modify the litigation injunction at any time after "the facts giving rise to their cause of actions arose in the 1990s" (*id.* at 12), after the receiver filed his complaint, after the *Javitch* decision in 2003, or after the *Star Bank* decision in 2008.

For another, whether the investors believed in "good faith" that the receiver was protecting their interests is not the relevant inquiry. It is whether they knew or should have known that they had an interest in the case that needed protection by way of intervention. As already discussed, the investors have been on notice of that fact since, at the absolute latest, 2008, when Judge Katz issued his decision in the *Star Bank* litigation.

Finally, I do not believe that the defendants are solely or even principally responsible for the many years that passed before the standing issue was resolved.

To be sure, they moved to compel arbitration before challenging, at least in this court, the receiver's standing. But defense memoranda dating back to 2003 shows they have taken essentially

23

the same position throughout the litigation. (*E.g.*, Doc. 36 at 5–6 (arguing that the receiver "does not have the authority to represent the creditor-investors that Capwill allegedly defrauded" and that "[f]raud on the investors that damages those investors is for those investors to pursue – not the receiver")).

*   *   *

In sum, there are circumstances present – the minimal progress in the case and the lack of prejudice – that weigh in favor of allowing the investors into this case.

But the investors' lengthy and unexplained delay in seeking to do so, whether measured from the time their interest in the case became apparent (2001) or from the time it was clear they had the right to intervene (either 2003 or 2008), weighs heavily in favor of denying the motion. In light of that delay, coupled with the lack of a valid basis for not intervening sooner and the absence of otherwise unusual circumstances, I conclude that the motion for leave to intervene is untimely, and that the investors may not intervene either as a matter of right under Civil Rule 24(a) or of discretion under Civil Rule 24(b).

For this reason alone, I will deny the motion.

## B. Interest in the Litigation

Taking a belt-and-suspenders approach, I also consider whether the investors have a substantial interest in this case.

"The proposed intervenors must show that they have a substantial interest in the subject matter of this litigation." *Coalition to Defend Affirmative Action*, *supra*, 501 F.3d at 780. The Sixth Circuit "has opted for a rather expansive notion of the interest sufficient to invoke intervention of right." *Id.* But establishing an interest in a given case "is necessarily fact-specific." *Id.*

24

According to the investors, they have an interest in asserting claims – indeed, the very claims that the receiver pleaded in his original complaint – "to recover more than $10.5 million in misappropriated trust property." (Doc. 112 at 13). They also note that, due to Judge Katz's standing decision, the receiver's claims that are still pending "present but a fraction of the damages sustained by the Liberte and Alpha Investors at the hands of Capwill and these defendants." (*Id.*).

The defendants deny that the investors have any interest in this case.

In the defense's view, Judge Katz's ruling on the extent of the receiver's standing winnowed the case down to claims for "the suitability and handling of the investments in Capwill's Wells Fargo accounts." (Doc. 116 at 11). In contrast, the defendants maintain, the investors' claims have nothing to with suitability and handling issues, and thus threaten to overwhelm what is left of this litigation. Finally, the defense emphasizes that the only claims the receiver has standing to pursue "have now been settled" in arbitration. (*Id.*). Consequently, the defendants argue, this case should, "but for the investor-plaintiffs' motion to intervene," be over. (*Id.*).

I agree with the defendants that the investors have no substantial interest in this case.

It is now law of the case that the receiver does not have standing to pursue claims to recover investor funds that VES held in escrow. *U.S. v. Todd*, 922 F.2d 399, 403 (6th Cir. 1990) ("the law-of-the-case doctrine states that a decision on an issue made by a court at one stage of a case should be given effect in successive stages of the same litigation") (internal quotation marks and citation omitted).

Because the receiver – that is, the named plaintiff in this suit – has no standing to pursue those claims, I have no subject-matter jurisdiction to adjudicate them. *Michigan v. Bay Mills Indian Community*, 695 F.3d 406, 411 (6th Cir. 2012) ("For each cause of action, federal jurisdiction must

25

be determined from what necessarily appears in the plaintiff's statement of his own claim[.]"); *see also Linke*, *supra*, 248 F. App'x at 655 ("The appointment of a receiver is inherently limited by the jurisdictional constraints of Article III and all other curbs on federal court jurisdiction.") (internal quotation marks and citation omitted).

Consequently, this case can go forward only as to the receiver's (now settled) claims involving the suitability and handling of the investments that the First Union defendants recommended for Capwill and VES; the other claims must be dismissed for want of subject-matter jurisdiction.

As the investors have essentially acknowledged, the suitability and handling claims involve but a fraction of the issues their claims would raise, and they could yield only a fraction of the damages. Accordingly, I agree that permitting the investors to intervene at this late date to pursue these claims, would substantially broaden the scope of the litigation. Such a maneuver, it seems to me, is not simply allowing them to intervene to protect their interest in the case; it is redefining the interests at the heart of this case.

The investors nevertheless maintain that the receiver's non-suitability and non-handling claims remain pending, and the bare fact that Judge Katz "issued a subsequent Opinion . . . which precluded the Receiver from pursuing those claims in arbitration does not vitiate them from the pleadings[.]" (Doc. 118 at 5).

Those objections do not respond to the defect in subject-matter jurisdiction that arose as a necessary result of Judge Katz's decision. As it now stands, there is no case or controversy here between the receiver and the defendants *vis-a-vis* the non-suitability and non-handling claims. In these circumstances, I am obliged to reckon with the receiver's limited standing and how it affects

the pending motion to intervene. *Cf. Adarand Constr., Inc. v. Mineta*, 534 U.S. 103, 109 (2001) (courts are "obliged to examine standing *sua sponte* where standing has been erroneously assumed").

It would be entirely inappropriate, it seems, to allow the investors to intervene – on the theory that they have a substantial interest in the non-suitability and non-handling claims – when this case no longer implicates that interest, and the court otherwise has no subject-matter jurisdiction to even adjudicate those claims.

Because the investors thus have no substantial interest in this case, they are not entitled to intervene.

### Conclusion

It is, therefore,

ORDERED THAT:

1.  The investors' motion for leave to file an intervening complaint (Doc. 112) be, and the same hereby is, denied;

2.  The investors' motions for class certification (Docs. 113, 114), and the defendants' motion to stay (Doc. 116), be, and the same hereby are, denied as moot;

3.  The clerk of court shall forthwith set this case for a telephonic status conference; not later than one week before that conference, the parties shall file a status report (or separate reports, if necessary) informing the undersigned as to what, if anything, remains to be done, and the schedule for doing it, before this case may be closed.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge

27